UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH D. TURNER,<br><br>        Petitioner,<br><br>    v.<br><br>J. PRICE, Warden,<br><br>        Respondent. | Case No. 14-cv-04374-JST (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled pro se petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Joseph D. Turner, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition. Petitioner has filed a traverse. The Court will deny the petition.

**I. PROCEDURAL HISTORY**

On December 1, 2011, a Contra Costa County jury found petitioner guilty of two counts of first degree residential robbery, one count of first degree residential burglary, three counts of false imprisonment, and one count of criminal threats. The jury also found true allegations that petitioner committed the offenses with a firearm. CT at 496-512.[1] On December 30, 2011, petitioner was sentenced to seven years in state prison. CT at 646-49, 662-64. The California Court of Appeal affirmed, and the California Supreme Court denied review. Exs. A, B. Petitioner

---

[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated. References to "CT" and "RT" are to the Clerk's Transcript and Reporter's Transcript of the state proceedings, Exs. C and E, respectively.

did not seek habeas relief in state court. The instant action was filed on September 29, 2014.

## II. FACTUAL BACKGROUND

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal:[2]

### A. *The Charged Offenses*

In the early morning hours of April 21, 2011, a home invasion robbery occurred at a residence on Pearce Street in Hercules, California. Romeo Sapinoso lived at the house with his girlfriend, Fernanda Cunha, a Brazilian national, and his nephew, Joseph Sapinoso. Also at the house was Cunha's cousin, Fernanda Rodrigues, who was visiting from Brazil.

At 3:50 a.m., Cunha was awakened by her dogs barking. Two men with guns walked into her bedroom. One gunman was an Asian male, who was fat, short, and bearded. The other gunman was tall, dark-skinned, and had a low voice. The gunmen wore black clothes, gloves, and beanies. The gunmen ordered Romeo to the floor. Cunha heard her cousin scream, and then saw the gunmen lead her cousin into Cunha's bedroom. The gunmen bound both women with tape. Cunha heard the men open drawers and take items. She heard other people downstairs. The gunmen took jewelry, Cunha's purse, her computer, watches, Cunha's cell phone, an iPad, and marijuana. Cunha kept marijuana in a transparent Tupperware container.

Romeo testified that he was awakened by screams and saw two men—one black and the other Filipino or Polynesian—enter his bedroom carrying guns. The black gunman gave Romeo a sock and told him to put it into his girlfriend's mouth. Both men ordered Romeo to the ground, then bound his hands behind his back with handcuffs. The black man left the bedroom, reentered it with Rodrigues, then ordered her to get into the bed with Cuhna. The men bound the women with tape. Romeo's nephew, Joseph, called out and Romeo told him to go back into his bedroom. Romeo testified that the gunmen took $4,200, a laptop computer, jewelry, a purse, and a Tupperware container of marijuana. At some point, Romeo heard the Polynesian gunman make a cell phone call and say, "'Boss, [ ] we're inside.'" After the noises stopped, Romeo got up, went to the hallway, and saw someone wearing a jacket with stripes walk out and close the front door.

After declaring Rodrigues unavailable for trial, Rodrigues's preliminary hearing testimony was read to the jury. Rodrigues testified that she was awakened by dogs barking. A man with a gun walked into her bedroom, covered her head with a blanket, and led her into her cousin's room. The gunman bound Rodrigues's hands and feet with tape.

Joseph, who was asleep in his own bedroom, was awakened to the sounds of a woman screaming and a dog barking. Joseph got up, opened his bedroom door, and heard his

---

[2] This summary is presumed correct. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

uncle say, "'It's okay. Don't trip. Just go back inside your room.'" From the space under his bedroom door, Joseph saw flashlights going by and a figure. Joseph saw a tall, white man, wearing black clothes. Joseph heard the sounds of tape being ripped and people rummaging all around the house. Joseph pretended to be asleep, and heard someone open his bedroom door and then close it.

Believing a robbery was occurring, Joseph got up out of bed and jumped out his bedroom window onto a neighbor's roof. From the roof, Joseph saw [petitioner], who was about five or six feet away, peek out a window at him. [Petitioner] said, "'Get back down here or I'll shoot you. And I have your sisters inside.'" Joseph jumped down from the roof, hid in some bushes, and then called 911 for help. Joseph identified the 911 recording, which was played for the jury. Joseph identified [petitioner] after [petitioner] said a few words in the presence of the police at the scene. At a subsequent in-field show-up, Joseph again identified [petitioner] as the man who threatened to shoot him. Joseph lost his iPad in the robbery.

### B. Police Investigation

#### 1. At the Scene

Corporal Joseph Vasquez of the Hercules Police Department arrived at the scene shortly after 4:00 a.m. Corporal Vasquez heard a woman scream, then saw [petitioner] walking from Pearce Street toward Skelly Street. [Petitioner] was wearing a black jacket with white stripes and was holding a clear Tupperware container that was partially concealed in a black garbage bag. Corporal Vasquez ordered [petitioner] to stop, but he turned and walked in the opposite direction. After Corporal Vasquez repeated the order to stop, [petitioner] complied, and walked toward the officer. The Tupperware container had five ounces of marijuana in it. [Petitioner] reported that while he was out walking with friends, he heard a woman scream and then he found the Tupperware container abandoned on a driveway. [Petitioner], who happened to be wearing latex gloves and had a roll of black garbage bags inside a pocket, picked up the Tupperware container. [Petitioner] also had a cell phone in his possession. [Petitioner] was detained as a suspect.

Corporal Vasquez saw Sergeant Ezra Tafesse contact Joseph, who appeared frantic and reported that he had been robbed. Joseph asked to hear [petitioner] speak before making an identification. From a window at the residence, Corporal Vasquez saw Romeo who reported that his hands were handcuffed. Two women came outside of the residence, who seemed visibly frantic and frightened. The residence appeared ransacked. Corporal Vasquez saw marijuana inside two bags on the pool table, inside a blue tub, and inside a black plastic bag. Altogether, three-fourths of a pound of marijuana was seized from inside the residence. Corporal Vasquez determined that a garage door had been forced open and found a pry bar on the ground near the door. Corporal Vasquez saw plastic packaging tape on the floor in one bedroom. Corporal Vasquez identified photos of [petitioner] at the time of his arrest, including a photo depicting him wearing latex gloves.

Sergeant Tafesse testified that he saw a silver-colored Toyota Highlander leaving the area near 190 Pearce Street. Sergeant Tafesse saw [petitioner] walking east on Pearce Street, approaching Skelly. [Petitioner] carried a large black plastic garbage bag. Sergeant Tafesse detained [petitioner]. Joseph was hiding in the bushes using a cell phone. Joseph

3

approached and was visibly upset.  Joseph reported that [petitioner] was involved in the robbery and had threatened to shoot him.  Later, at an in-field show-up, Joseph again identified [petitioner].  Romeo identified [petitioner] as the individual, wearing the black jacket with white stripe, who was the last person to leave the house.

### *2. [Petitioner]'s Statements to Police and Subsequent Criminal Investigation*

Detective Alexander Abetkov testified that [petitioner] waived his rights and made a statement.  [Petitioner] said he had been home asleep on the couch, when an unidentified friend called at 3:00 a.m., saying he was downstairs in his car and asking [petitioner] to come outside.  [Petitioner] went outside and got into his friend's car.  The friend drove [petitioner] to Pinole and stopped at a residence the friend claimed "was being robbed."  [Petitioner] saw flashlights being used inside the residence at 190 Pearce Street.  [Petitioner]'s friend drove past the residence a couple of times and discussed with [petitioner] "whether or not they were going to call the police or [whether] they were going to steal property from the people that were there robbing the house."  [Petitioner]'s friend said stolen property had been placed outside on the driveway.  [Petitioner] believed there were two robbers inside the house because he saw two flashlights being used.  The driver told [petitioner] to put on latex gloves that were inside the car and to go out and pick up the loot in the driveway.  [Petitioner] went out and picked up the marijuana in the Tupperware container, as well as a roll of garbage bags.  [Petitioner] discovered that his friend had driven off.  [Petitioner] said his friend drove a small, dark-silver-colored SUV.  [Petitioner] later gave a different story to Corporal Vasquez.  [Petitioner] feared disclosing the identity of the male friend who drove him to the residence.  [Petitioner]'s cell phone showed a series of calls to "D–Boy."

Detective Abetkov executed a search warrant for a Hercules residence associated with D–Boy's cell phone.  D–Boy was identified as Tawn Saeteurn.  Saeteurn's Celica was searched, as was a Toyota Highlander associated with Saeteurn's residence.  A search of the Celica revealed a box of face masks and a bundle of latex gloves.

Initially, [petitioner] denied planning the robbery or going inside the residence.  [Petitioner] admitted knowing about the robbery only minutes before arriving at the residence.  Later, while searching [petitioner]'s residence, [petitioner] told Detective Abetkov that he had more information.  Expressing concern over his fate, [petitioner] asked if he could provide more details about the robbery.  Detective Abetkov explained that [petitioner] was going to jail and that no promises would be made for any such information.  Thereafter, [petitioner] gave the following "hypothetical version" of events: "D–Boy owed some money to another individual, not a ridiculously large amount of money but a substantial amount, and that he knew that Mr. Turner was unemployed, and that D–Boy had a crew that was doing robberies in the area, and that basically Mr. Turner could profit if he was able to provide a victim locally, maybe in Hercules, of a house that they could hit where they could get cash and whatever else they were looking for."  [Petitioner] told D–Boy that he had heard on the street that the residence contained cash and possibly drugs.  [Petitioner] said he merely passed this information to D–Boy and never intended to assist in any robbery.  Eventually, [petitioner] admitted that he agreed to go to the robbery with D–Boy.  Once they arrived at the residence, [petitioner] put on gloves and followed D–Boy inside.  D–Boy told [petitioner] to look around the house for loot.  D–Boy showed [petitioner] a text that reported, "the guy, the nephew, 15–year old,

4

and two bitches, were tied up upstairs in the house." D–Boy gave [petitioner] a Tupperware container with marijuana in it. [Petitioner] went outside to get some air. While outside, [petitioner] received a text from D–Boy saying they had to leave. [Petitioner] reentered the house and saw two individuals leaving the residence, one of whom pointed a gun at [petitioner] on the way out. In the end, [petitioner] admitted he was inside the residence.

Cuhna's cell phone was located following a search of a residence in Richmond that was associated with an individual named Shameel Ali. D–Boy's cell phone showed texts were exchanged with the cell phone associated with Ali. Photos taken from Ali's residence led to the issuance of arrest warrants for Francis Tualaga Taylor, Jr., and Troy Alexander.

The jury viewed video-recordings of [petitioner]'s three taped statements.

*C. Defense Case*

Hercules Police Corporal John Gallegos testified that he took a statement from Joseph. Joseph reported that after he jumped out of the window, one suspect put his head out of the window and told Joseph to get back inside the residence. The suspect said, "'We have the girls.'" Joseph said he could identify the suspect's clothing but could not identify the suspect's face.

People v. Turner, No. A134275, 2013 WL 6858128, at *1-4 (Cal. Ct. App. Dec. 30, 2013) (footnotes omitted).

## III. DISCUSSION

### A.  Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the

constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The state court decision to which 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  The final state court decision from the California Supreme Court summarily denied petitioner's state habeas petition.  The California Court of Appeal, in its opinion on direct review, was the only state court decision that addressed the claim petitioner raises in the instant petition.  The state court of appeal thus was the highest state court to have reviewed the claims in a reasoned decision, and thus it is the state court of appeal's decision that this Court reviews herein.

6

**B.     Petitioner's Claims**

**1.     Exhaustion**

On January 26, 2015, upon an initial review of the petition, the Court determined that the petition appeared to be a "mixed" petition, i.e., a petition containing both exhausted and unexhausted claims, and ordered petitioner to elect how he wished to deal with the problem. Specifically, petitioner was directed to inform the Court whether he elected to: (1) dismiss the unexhausted claims and go forward in this action with only the remaining claims; or (2) dismiss this action and return to state court to exhaust all of his claims before returning to federal court to present all of his claims in a new petition; or (3) move for a stay of these proceedings while he exhausted his state court remedies for the unexhausted claims.

The Court noted that it could not determine exactly which claims were exhausted because the record did not include the petition for review filed in the California Supreme Court. The Court could only compare the opinion of the California Court of Appeal on direct review[3] to the federal petition to determine whether all the claims in the latter were included in the former, and concluded that some were not.

On February 25, 2015, petitioner filed a response in which he stated that he elected to dismiss the unexhausted claims and go forward with only the exhausted claims. The response still did not specify which of petitioner's federal claims had been presented to the California Supreme Court. This information is required to determine whether petitioner satisfied the exhaustion requirement. On April 16, 2015, the Court ordered respondent to show cause why a writ of habeas corpus should not be granted as to the five claims petitioner raised in his direct appeal to the California Court of Appeal, which claims were also raised in the federal petition. Those claims were numbered as follows: (1) the trial court erroneously denied petitioner's motion to represent himself, brought pursuant to Faretta v. California, 422 U.S. 806 (1975); (2) the prosecution failed to produce discovery showing that one of the victims had identified petitioner at the crime scene, prior to the in-field show-up; (3) the trial court erroneously excluded evidence that one of the

---

[3] See People v. Turner, No. A134275, 2013 WL 6858128 (Cal. Ct. App. Dec. 30, 2013).

victims had been granted immunity in exchange for his testimony; (4) the trial court erroneously allowed a late amendment to the information; and (5) the late amendment to the information rendered trial counsel ineffective during plea negotiations.

On July 10, 2015, respondent filed an answer asserting that Claim 1 is the "single exhausted federal claim." See Dkt. No. 6 at 3. Respondent submitted with his answer a copy of petitioner's petition for review filed in the California Supreme Court, see Ex. B, which confirms that Claim 1 was the only claim presented to the California Supreme Court, and therefore, the only exhausted claim.

Thereafter, the Court offered petitioner a second opportunity to elect whether he wished to go forward in this action on the only exhausted claim or attempt to exhaust Claims 2-5 in state court. Petitioner has filed a response. See Dkt. No. 10. While he does not make an election, he states that he can no longer return to state court to exhaust because the time for filing a state habeas petition has now expired, and no exhaustion opportunities remain open to him. Id. at 9.[4] The Court construes this as an election to dismiss the unexhausted claims and go forward in this action with only Claim 1.

Petitioner nonetheless asks that this Court review all five claims, arguing that direct review to the state court of appeal was sufficient to exhaust. Id. at 5. Petitioner's contention is incorrect. Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c); Rose v. Lundy, 455 U.S. 509, 515-16 (1982); Duckworth v. Serrano, 454 U.S. 1, 3 (1981); McNeeley v. Arave, 842 F.2d 230, 231 (9th Cir. 1988). The state h,igh court must be given an opportunity to rule on the claims even if review is discretionary. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (petitioner must invoke "one complete round of

---

[4] Page number citations for petitioner's filings refer to those assigned by the Court's electronic filing system and are located at the top right-hand corner of each page.

the State's established appellate review process.").

It is clear from the filed papers that petitioner did not raise Claims 2-5 in the California Supreme Court. See Ex. B. Accordingly, these claims are unexhausted. Although the Court may deny the claims on the merits even if they are unexhausted, see 28 U.S.C. § 2254(b)(2)[5], it is not required to do so. See Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999). Therefore, Claims 2-5 are DISMISSED without prejudice as unexhausted, and the only claim that remains for adjudication is Claim 1, i.e., that the trial court erroneously denied petitioner's motion to represent himself, brought pursuant to Faretta v. California, 422 U.S. 806 (1975).[6]

### 2. **Faretta Claim**

Petitioner claims that the trial court improperly denied his motion to represent himself under Faretta . The state appellate court described the relevant facts:

> Trial was set to commence on November 21, 2011. At the November 16, 2011 readiness conference, defense counsel advised the court that [petitioner] wanted to make a Marsden[7] motion. At the Marsden hearing, [petitioner] claimed he needed a new attorney because: 1) his appointed counsel was not adequately prepared; 2) counsel's lack of preparation had interfered with a meaningful opportunity to resolve the case with a plea bargain; 3) counsel failed to get a reduction in bail; 4) counsel failed to engage in "aggressive" discovery; 5) counsel was unaware of [petitioner]'s version of the relevant events; and 6) the attorney-client relationship had broken down to such an extent that effective communication no longer occurred.
>
> In response, defense counsel reported that he had practiced in the county for 11 years and had handled over 30 felony trials. Counsel explained that he advised [petitioner] that the issue of identification would best be challenged at trial not by pretrial motion, and that a motion to dismiss the information was not applicable. Counsel further represented that the bail issue was subordinated to negotiating a reasonable disposition before possible amendment of the information or joinder with other co-participants. As to [petitioner]'s desire to testify, counsel said that he advised [petitioner] that taking the stand would be

---

[5] The court may do so "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005).

[6] Petitioner argues in the alternative that respondent waived the exhaustion defense by failing to raise it in a motion to dismiss. See Dkt. No. 10 at 5. This is incorrect. The state waives the exhaustion requirement only by doing so explicitly through counsel. See 28 U.S.C. § 2254(b)(3).

[7] Under California law, when a defendant requests substitution of court-appointed counsel, the trial court has a duty to listen to his or her specific reasons for the request. People v. Marsden, 2 Cal. 3d 118, 123-25 (1970). This in short-hand is known as a "Marsden motion" or a request for a "Marsden hearing." See Schell v. Witek, 218 F.3d 1017, 1021 (9th Cir. 2000).

> detrimental, particularly given the circumstances that appellant was found at 4:00 a.m., wearing surgical gloves, and in possession of stolen property, a block away from the residence that was burglarized. Counsel said that he was "certain" that that he could "adequately prepare" for the case, and would make himself available to discuss the evidence with [petitioner].
>
> The trial court found that counsel was providing adequate representation and found no irreconcilable conflict. After the court denied [petitioner]'s motion for substitute counsel, [petitioner] asked the court to allow self-representation. In response, the court gave the following admonition: "This is the eve of trial; and I don't necessarily have to grant your [Faretta request] unless you are prepared to proceed on Monday."
>
> [Petitioner] said that he "absolutely would not be prepared to proceed" to trial on Monday. The prosecutor objected to continuing the trial, representing that the victims would experience "extreme hardship" in that they were "Brazilian nationals and are waiting to go home for the holidays after this trial."
>
> In denying the motion, the trial court ruled as follows: "Mr. Turner, I appreciate the fact that you would like to represent yourself; you have a federal constitutional right to represent yourself. And in order to invoke this unconditional right, you must assert it within a reasonable time prior to the commencement of trial. [¶] In considering the quality of your counsel's representation, I believe it to be strong—despite the fact that you criticize it. I find him to be an excellent attorney. And I am not speaking generally although I could speak of him generally—I am speaking in this case of the motions that he has filed and the work that he has done. [¶] I am finding that the timeliness issue–and considering the totality of the circumstances that exist at this time, I believe that you are misusing this motion to unjustifiably delay the trial and obstruct the ordinary administration of justice."

People v. Turner, 2013 WL 6858128, at *4-5.

Jury trial began as scheduled on Monday, November 21, 2011. CT at 457. Petitioner made no further request for self-representation.

The California Court of Appeal concluded that the trial court did not abuse its discretion in denying petitioner's Faretta motion because petitioner's request was made on the eve of trial and because petitioner could not represent himself without a continuance, which would have resulted in hardship to key witnesses. People v. Turner, 2013 WL 6858128, at *6. Further, the appellate court rejected petitioner's claim that the trial court failed to inquire whether the timing of the request was justified. Id. at *6-7.

A criminal defendant has a Sixth Amendment right to self-representation. Faretta v. California, 422 U.S. 806, 832 (1975). But a defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of

10

1    securing delay. Id. at 835; United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994); Adams v.
2    Carroll, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989).
3          The Faretta language describing Mr. Faretta's request to represent himself as having been
4    made "weeks before trial," 422 U.S. at 835, is part of the holding of the Court, and thus is "clearly
5    established Federal law, as determined by the Supreme Court of the United States," for purposes
6    of relief under the current version of 28 U.S.C § 2254(d). Moore v. Calderon, 108 F.3d 261, 265
7    (9th Cir. 1997), abrogated on other grounds by Williams v. Taylor, 529 U.S. 362 (2000). After
8    Moore, we know that Faretta clearly established some timing element, but we do not know the
9    precise contours of that element beyond the fact that requests made "weeks before trial" are
10   timely. Marshall v. Taylor, 395 F.3d 1058, 1061 (9th Cir. 2005). Because the Supreme Court has
11   not clearly established when a Faretta request is untimely, other courts, including state courts, are
12   free to do so, as long as they comport with the Supreme Court's holding that a request made
13   "weeks before trial" is timely. Id. The California Supreme Court has held that a Faretta motion
14   must be made "within a reasonable amount of time prior to the commencement of trial." See
15   People v. Windham, 19 Cal. 3d 121, 127-28 (1977). Windham directs the trial court to consider
16   certain criteria, including "the quality of counsel's representation of the defendant, the defendant's
17   prior proclivity to substitute counsel, the reasons for the request, the length and stage of the
18   proceedings, and the disruption or delay which might reasonably be expected to follow the
19   granting of such a motion." Id. at 128.
20         A request to represent oneself "need not be granted if it is intended merely as a tactic for
21   delay." United States v. Flewitt, 874 F.2d 669, 674 (9th Cir. 1989). A court may consider (1) the
22   effect of any resulting delay on the proceedings, and (2) events preceding the motion, to determine
23   whether they were consistent with a good faith assertion of the Faretta right and whether the
24   defendant could reasonably be expected to have made the motion at an earlier time. Avila v. Roe,
25   298 F.3d 750, 753-54 (9th Cir. 2002) (remanding for evidentiary hearing, where district court
26   failed to consider first factor and failed to give any weight to state appellate court's findings
27   regarding second factor).
28         As noted above, the state court of appeal found that the Faretta motion was properly denied

as untimely. The issue for this Court is whether the state court opinion was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. "If Supreme Court cases 'give no clear answer to the question presented,' the state court's decision cannot be an unreasonable application of clearly established federal law." Ponce v. Felker, 606 F.3d 596, 604 (9th Cir. 2010) (quoting Wright v. Van Patten, 552 U.S. 120, 126 (2008)). Petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Visciotti, 537 U.S. 19, 25 (2002). Specifically, petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 552 U.S. 86, 103 (2011).

Here, petitioner made his Faretta request five days before trial, timing that does not meet the "weeks before trial" standard Faretta itself established. Moreover, the California Court of Appeal also considered the pertinent factors outlined in the Windham case, which is permissible. See Avila, 298 F.3d at 753-54. Petitioner has failed to demonstrate that the state court opinion was unreasonable in light of the exacting standard described above. See generally Randle v. California, 142 F. App'x 977 (9th Cir. 2005) (state court did not err in denying as untimely a Farretta motion made two weeks prior to the beginning of trial, and employing the balancing of factors identified in Windham).

This Court finds that the state court's determination that petitioner's Faretta motion was untimely was not an unreasonable application of Supreme Court authority. The claim is therefore denied.

## C. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

12

certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### III. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

Dated: April 7, 2016

_____
JON S. TIGAR
United States District Judge